## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELFIN RABINOVICH, Derivatively on Behalf of INTERCEPT PHARMACEUTICALS, INC, | Case No.: |
| Plaintiff, | **DEMAND FOR JURY TRIAL** |
| vs. | |
| PAOLO FUNDARÒ, LUCA BENATTI, NANCY MILLER-RICH, DANIEL WELCH, MARK PRUZANSKI, DANIEL BRADBURY, GINO SANTINI, SRINIVAS AKKARAJU, KEITH GOTTESDIENER and GLENN SBLENDORIO, | |
| Defendants, | |
| And | |
| INTERCEPT PHARMACEUTICALS, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Delfin Rabinovich ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Intercept Pharmaceuticals, Inc. ("Intercept" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Intercept with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of

public record.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of Intercept against certain of its officers and directors seeking to remedy the Director Defendants' (as defined below) breach of fiduciary duties, abuse of control, and unjust enrichment that occurred between September 28, 2019 and October 7, 2020, both dates inclusive (the "Relevant Period") and have caused substantial harm to Intercept.

2.     Intercept is a biopharmaceutical company that focuses on the development and commercialization of therapeutics to treat progressive non-viral liver diseases in the U.S.

3.     Intercept's lead product candidate is Ocaliva (obeticholic acid ("OCA")), a farnesoid X receptor agonist used for the treatment of primary biliary cholangitis ("PBC"), a rare and chronic liver disease, in combination with ursodeoxycholic acid in adults.  The Company is also developing OCA for various other indications, including nonalcoholic steatohepatitis ("NASH").

4.     In 2016, the U.S. Food and Drug Administration ("FDA") granted accelerated approval of Ocaliva for treating PBC.

5.     Then, in late 2017, both Intercept and the FDA issued warnings concerning the risk of overdosing patients with the drug, and multiple reports of severe liver injuries and deaths linked with its use.

6.     Despite these concerns, Defendants continued to tout Ocaliva sales and purported benefits, and its potential indication for treating various other medical conditions.  For instance, just two years later, in September 2019, Intercept submitted a New Drug Application ("NDA") to

the FDA for OCA to treat patients with liver fibrosis due to NASH.

7.      Throughout the Relevant Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants downplayed the true scope and severity of safety concerns associated with Ocaliva's use in treating PBC; (ii) the foregoing increased the likelihood of an FDA investigation into Ocaliva's development, thereby jeopardizing Ocaliva's continued marketability and the sustainability of its sales; (iii) any purported benefits associated with OCA's efficacy in treating NASH were outweighed by the risks of its use; (iv) as a result, the FDA was unlikely to approve the Company's NDA for OCA in treating patients with liver fibrosis due to NASH; and (v) as a result of all the foregoing, the Company's public statements were materially false and misleading at all relevant times.

8.      On May 22, 2020, the Company reported that the FDA "has notified Intercept that its tentatively scheduled June 9, 2020 advisory committee meeting (AdCom) relating to the Company's [NDA] for [OCA] for the treatment of liver fibrosis due to [NASH] has been postponed" to "accommodate the review of additional data requested by the FDA that the company intends to submit within the next week."

9.      On this news, the Company's stock price fell $11.18 per share, or 12.19%, to close at $80.51 per share on May 22, 2020.

10.     On June 29, 2020, the Company issued a press release reporting that the FDA had issued a Complete Response Letter ("CRL") rejecting the Company's NDA for Ocaliva for the treatment of liver fibrosis due to NASH.  According to that press release, "[t]he CRL indicated

that, based on the data the FDA has reviewed to date," the FDA "has determined that the predicted benefit of OCA based on a surrogate histopathologic endpoint remains uncertain and does not sufficiently outweigh the potential risks to support accelerated approval for the treatment of patients with liver fibrosis due to NASH."  The press release further advised, among other things, that the "[t]he FDA recommends that Intercept submit additional post-interim analysis efficacy and safety data from the ongoing REGENERATE study in support of potential accelerated approval and that the long-term outcomes phase of the study should continue."

11.     On this news, the Company's stock price fell $30.79 per share, or 39.73%, to close at $46.70 per share on June 29, 2020.

12.     Then, on October 8, 2020, news outlets reported that Intercept was "facing an investigation from the [FDA] over the potential risk of liver injury in patients taking Ocaliva, [Intercept's] treatment for primary biliary cholangitis, a rare, chronic liver disease."

13.     On this news, the Company's stock price fell $3.30 per share, or 8.05%, to close at $37.69 per share on October 8, 2020. Thereafter, a securities class action entitled *Chauhan v. Intercept Pharmaceuticals, Inc., et al.*, Case 1:20-cv-05377 (E.D.N.Y.) ("Securities Class Action") was commenced against the Company, Mark Pruzanski and Sandip S. Kapadia.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question seeking contribution under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

4

to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff**

18.     *Plaintiff Delfin Rabinovich* ("Plaintiff") is, and was at relevant times, a shareholder of Intercept.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

19.     *Nominal Defendant Intercept Pharmaceuticals, Inc.* ("Intercept" or the "Company") is a Delaware corporation with principal executive offices located at 10 Hudson Yards, 37th Floor, New York, New York 10001.

**Director Defendants**

20.     *Defendant Paolo Fundarò* ("Fundarò") is the Company's President, Chief Executive Officer, and a Chairman of the Company's Board of Directors (the "Board").

21.     *Defendant Luca Benatti, Ph.D.* ("Benatti") has served as a member of Intercept's Board since July 2014.  Defendant Benatti is a member of Research and Development Committee.  The Research and Development Committee's primary purpose is to assist the Board

in its oversight of the Company's strategic direction and investment in research and development, technology and manufacturing and to identify and discuss significant emerging trends and issues in science and technology and consider their potential impact on the Company.

22.     **Defendant Nancy Miller-Rich** ("Miller-Rich") has served as a member of Intercept's Board since April 2018.

23.     **Defendant Daniel Welch** ("Welch") has served as a member of Intercept's Board since November 2015.

24.     **Defendant Mark Pruzanski, M.D.** ("Pruzanski") is one of the Company's co-founders and has served as its President and Chief Executive Officer, and as a member of its Board, since inception in 2002.

25.     **Defendant Daniel Bradbury** ("Bradbury") has served as a member of Intercept's Board since July 2016.  Defendant Bradbury is a member of the Audit Committee.

26.     **Defendant Gino Santini** ("Santini") has served as a Director since February 2018 and as a member of Intercept's Board since November 2015.  Defendant Santini is a member of the Audit Committee.

27.     **Defendant Srinivas Akkaraju, M.D., Ph.D.** ("Akkaraju") has served as a member of Intercept's Board since October 2012.  Defendant Akkaraju is a member of Research and Development Committee.

28.     **Defendant Keith Gottesdiener, M.D.** ("Gottesdiener") has served as a member of Intercept's Board since July 2016.   Defendant Gottesdiener is a member of Research and Development Committee.

29.     **Defendant Glenn Sblendorio** ("Sblendorio") has served as a member of

6

Intercept's Board since February 2014. Defendant Sblendorio is a member of the Audit Committee. Defendant Sblendorio claims to have extensive experience in the pharmaceutical and biotechnology industries, leadership skills, operational and strategic expertise and financial knowledge, which enables him to serve as a financial expert on the Company's Audit Committee.

30.     Defendants Fundarò, Miller-Rich, Welch, Pruzanski, Bradbury, Santini, Akkaraju, Gottesdiener, Gottesdiener and Sblendorio are collectively referred to hereinafter as the "Director Defendants."

## CORPORATE GOVERNANCE

31.     As members of the Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

32.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Intercept, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF DEFENDANTS

33.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Intercept, the Director Defendants owed Intercept and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage Intercept in an honest and lawful manner. The Director Defendants were and are

required to act in furtherance of the best interests of Intercept and its investors.

34.     Each director of the Company owes to Intercept and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

35.     To discharge their duties, the officers and directors of Intercept were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Intercept were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate

statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Intercept conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

36.     Each Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Intercept, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

**AUDIT COMMITTEE CHARTER**

9

37.     The Audit Committee Charter states:

The primary purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Intercept Pharmaceuticals, Inc. (the "Corporation") is to act on behalf of the Board in fulfilling the Board's oversight responsibilities with respect to the Corporation's accounting and financial reporting practices, systems of internal control over financial reporting and audit process, as well as the quality and integrity of the Corporation's financial reports, the qualifications, independence and performance of the Corporation's independent registered public accounting firm (the "Independent Auditor"), the performance of the Corporation's internal audit function and the Corporation's processes for monitoring compliance with legal and regulatory requirements and the Corporation's Global Code of Business Conduct.

The Committee's responsibility is oversight. Management is responsible for the Corporation's financial statements, the appropriateness of the Corporation's accounting principles and reporting policies and the establishment and maintenance of adequate internal control over financial reporting. The Independent Auditor is responsible for performing an audit of the Corporation's annual financial statements and the Corporation's internal control over financial reporting, expressing an opinion as to the conformity of the Corporation's annual financial statements with generally accepted accounting principles, reviewing the Corporation's quarterly financial statements and other procedures. Each member of the Committee shall be entitled to rely on (i) the integrity of those persons within the Corporation and of the professionals and experts (such as the Independent Auditor) from which the Committee receives information, (ii) the accuracy of the financial and other information provided to the Committee by such persons, professionals or experts absent actual knowledge to the contrary and (iii) representations made by the Independent Auditor as to any non-audit services provided by the Independent Auditor to the Corporation.

*     *     *

## III.          DUTIES AND RESPONSIBILITIES

The Committee shall be directly responsible for the appointment, retention, compensation, evaluation, oversight and, if necessary, termination of the Independent Auditor and any other independent registered public accounting firm engaged by the Corporation (including resolution of disagreements between management and the Independent Auditor or any such other firm regarding financial reporting) for the purpose of preparing or issuing an audit report or related work. The Independent Auditor and each such other firm shall report directly to the Committee. The Committee may, in its discretion, seek stockholder

ratification of its appointment of the Independent Auditor and make recommendations to the Corporation's stockholders with respect thereto.

The following shall be recurring duties and responsibilities of the Committee in carrying out its purposes. These duties and responsibilities are set forth below as a guide to the Committee, with the understanding that the Committee may alter or supplement them as appropriate under the circumstances, to the extent permitted by applicable law.

A.      **Financial Statements and Financial Reporting Process**

1.      Review and discuss with management and the Independent Auditor the Corporation's annual financial statements, management's discussion and analysis related thereto and other disclosures to be made in the Corporation's Annual Report on Form 10-K prior to the filing thereof, including a discussion with the Independent Auditor of the matters required to be discussed under the applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB"), and recommend to the Board whether such financial statements should be included in the Corporation's Annual Report on Form 10-K.

2.      Review and discuss with management and the Independent Auditor the Corporation's quarterly financial statements, management's discussion and analysis related thereto and other disclosures to be made in the Corporation's Quarterly Report on Form 10-Q prior to the filing thereof, including a discussion with the Independent Auditor of the matters required to be discussed under the applicable requirements of the PCAOB.

3.      Discuss with management the Corporation's earnings press releases and review the type and presentation of information to be included therein, including the use of "pro forma" or "adjusted" non-GAAP information.

4.      Review with management and the Independent Auditor the effect of regulatory and accounting pronouncements and initiatives on the Corporation's financial statements.

5.      Discuss with management and the Independent Auditor significant accounting of financial reporting issues and judgments made in connection with the preparation of the Corporation's financial statements, including any significant changes in the Corporation's selection or application of accounting principles, complex or unusual transactions (such as off-balance sheet structures and transactions, if any) and areas requiring significant judgments.

11

6.      In consultation with the Independent Auditor and the internal auditors, review the integrity of the Corporation's financial reporting processes, both internal and external.

7.      Report regularly to and review with the full Board any issues that arise with respect to the quality or integrity of the Corporation's financial statements, compliance with legal or regulatory requirements, the performance and independence of the Independent Auditor or the performance of the internal audit function.

8.      Discuss with the Independent Auditor the matters required to be discussed under the applicable requirements of the PCAOB relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, any significant disagreements with management and any significant changes in the audit plan.

9.      Receive, review and discuss reports and other communications required to be made by the Independent Auditor regarding (i) all critical accounting policies and practices; (ii) any critical audit matters arising from the current period audit; (iii) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the Independent Auditor; (iv) other material written communications between the Independent Auditor and management, such as any management letter or schedule of unadjusted differences; and (v) all other matters required to be communicated by the Independent Auditor to the Committee under the standards of the PCAOB and SEC rules.

10.     Maintain and foster an open avenue of communication among the Committee and the Independent Auditor, the Corporation's financial management and the internal auditors.

11.     Annually review and approve the Committee's report for inclusion in the Corporation's proxy statement or any other applicable filing as required by the SEC.

12.     Review any other reports the Corporation issues that relate to Committee responsibilities.

## THE RESEARCH AND DEVELOPMENT CHARTER

38.    The Research and Development Committee Charter states:

**I.    PURPOSE**

The purpose of the Research and Development Committee (the "Committee") of the Board of Directors (the "Board") of Intercept Pharmaceuticals, Inc. (the "Corporation") is to assist the Board in its oversight of the Corporation's strategic direction and investment in research and development, technology and manufacturing (collectively, "R&D") and to identify and discuss significant emerging trends and issues in science and technology and consider their potential impact on the Corporation.

*     *     *

**III.    DUTIES AND RESPONSIBILITIES**

The following shall be recurring duties and responsibilities of the Committee in carrying out its purposes. These duties and responsibilities are set forth below as a guide to the Committee, with the understanding that the Committee may alter or supplement them as appropriate under the circumstances, to the extent permitted by applicable law.

1.    Identify and discuss new and emerging trends in health care, pharmaceutical science, technology, manufacturing and regulation to assist the Corporation in making well-informed choices in the investment of its R&D resources.

2.    Review, evaluate and advise the Board regarding the quality, direction and competitiveness of the Corporation's R&D programs.

3.    Review, evaluate and advise the Board regarding the Corporation's progress in achieving its long-term strategic R&D goals and objectives

4.    Review and make recommendations to the Board regarding the Corporation's internal and external investments in R&D, including any potential external investments in R&D (e.g., potential acquisitions, alliances, collaborations, equity investments, manufacturing, contracts and grants) that are submitted to the Board for approval.

5.    Regularly review the Corporation's product development pipeline.

6.    Annually review and reassess the adequacy of this Charter and

13

recommend to the Board any proposed changes for approval.

7.      Annually evaluate the Committee's performance.

8.      Perform any other activities consistent with this Charter, the Corporation's Bylaws and governing law or regulation, as the Committee or the Board deems necessary or appropriate.

## SUBSTANTIVE ALLEGATIONS

**Background**

39.     The Company is a biopharmaceutical company that focuses on the development and commercialization of therapeutics to treat progressive non-viral liver diseases in the U.S.

40.     The Company's lead product candidate is OCA, a farnesoid X receptor agonist used for the treatment of PBC, a rare and chronic liver disease, in combination with ursodeoxycholic acid in adults. The Company is also developing OCA for various other indications, including NASH.

41.     In May 2016, the Company reported that the FDA had approved Ocaliva for the treatment of patients with PBC, granting the drug accelerated approval for that indication.

42.     Then, in late 2017, both the Company and the FDA issued warnings concerning the risk of overdosing patients with the drug, and multiple reports of severe liver injuries and deaths linked to its use. For instance, in September 2017, the Company issued a letter, warning physicians against overdosing patients with Ocaliva, advising them that the drug has been tied to liver injuries and death among patients suffering from PBC. The FDA also issued a safety announcement later in September 2017 entitled "FDA Drug Safety Communication: FDA warns about serious liver injury with Ocaliva for rare chronic liver disease," warning doctors after reports of multiple deaths linked to the drug.

43.     Despite these concerns, Defendants continued to tout Ocaliva sales and OCA's purported benefits, and its potential indication for treating various other medical conditions. For instance, just two years later, in September 2019, the Company submitted an NDA to the FDA for OCA to treat patients with liver fibrosis due to NASH.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

44.     On September 27, 2019, the Company issued a press release touting that it had submitted an NDA to the FDA for OCA to treat patients with liver fibrosis due to NASH (the "September 2019 Press Release").  That press release also touted that "[t]he submission is based on positive interim analysis results from the pivotal Phase 3 REGENERATE study in patients with liver fibrosis due to NASH"; that, "[i]n the study, OCA 25 mg achieved its primary endpoint by demonstrating robust improvement in liver fibrosis (by ≥1 stage) without worsening of NASH at 18 months (p=0.0002 vs placebo)"; that "OCA is the only investigational therapy to meet the primary endpoint of a Phase 3 study in patients with NASH and is the only such therapy that the FDA has designated a Breakthrough Therapy for NASH with fibrosis"; and that, "[a]s such, Intercept has requested a Priority Review for the NDA, which, if granted, would result in an anticipated six-month review period."

45.     The September 2019 Press Release also quoted Defendant Pruzanski" "submission of the first NDA for the treatment of fibrosis due to NASH is a very important milestone for the field and the culmination of more than a decade of hard work" and that the Company "look[s] forward to continuing to work with the FDA through the NDA review period and believe[s] that, if approved, OCA has the potential to become an essential treatment for people living with advanced fibrosis due to NASH."

15

46.     On November 25, 2019, the Company issued a press release touting that the FDA had accepted its NDA for OCA seeking accelerated approval for the treatment of liver fibrosis due to NASH and had granted the NDA priority review (the "November 2019 Press Release"). That press release reiterated substantively the same statements as referenced in ¶ 44 above, touting the NDA submission and the study results that supported it, while further representing that "[t]he FDA has assigned a Prescription Drug User Fee Act (PDUFA) target action date of March 26, 2020 for the NDA," and that, "[i]n the NDA filing acceptance notification letter, the FDA also indicated that it currently plans to hold an advisory committee meeting to discuss the application."

47.     Further, the November 2019 Press Release quoted Defendant Pruzanski: "[i]f approved, OCA would be the first available therapy for patients with fibrosis due to NASH, a condition that is expected to become the leading cause of liver transplant in the U.S. as soon as 2020"; that "[i]t is exciting to achieve this critical regulatory milestone that brings [the Company] one step closer to [its] goal of delivering the first approved therapeutic to those living with this devastating disease"; that, "[f]rom OCA's prior designation as a Breakthrough Therapy to the grant of priority review today, [the Company's] work with FDA continues to set an important precedent for the field"; and that the Company "look[s] forward to working with the [FDA] over the coming months as they review the first NDA in NASH."

48.     On February 25, 2020, the Company issued a press release reporting its fourth quarter and full year 2019 financial results and certain business updates (the "February 2020 Press Release").  That press release quoted Defendant Pruzanski: "2019 was a pivotal year for Intercept given the positive results in [the Company's] Phase 3 REGENERATE study in liver

fibrosis due to NASH and [its] subsequent filing for approval in both the U.S. and Europe"; that, "[a]t the same time, [the Company's] commercial team's outstanding execution helped [them] deliver net sales of approximately $250 million for Ocaliva in 2019 and they continue to reach more PBC patients globally"; and that, "[a]s [the Company] enter 2020, [the Company is] focused on successfully completing the U.S. regulatory process and ensuring full readiness to launch the first approved therapy for patients suffering from fibrosis due to NASH."

49.    With respect to the Company's sales of Ocaliva, the February 2020 Press Release stated that "[f]ull year 2019 Ocaliva net sales were $249.6 million, which represented growth of 40% as compared to the prior year"; that "Ocaliva net sales in 2019 were comprised of U.S. net sales of $187.5 million and ex-U.S. net sales of $62.1 million, as compared to U.S. net sales of $140.8 million and ex-U.S. net sales of $37.0 million in 2018"; that the Company "recognized $70.3 million of Ocaliva net sales in the fourth quarter of 2019, which represented growth of 33% as compared to the prior year quarter"; and that "Ocaliva net sales in the fourth quarter of 2019 were comprised of U.S. net sales of $53.5 million and ex-U.S. net sales of $16.8 million, as compared to U.S. net sales of $41.1 million and ex-U.S. net sales of $11.8 million in the prior year quarter"; all of which indicated to the market the sustainability of the Company's revenues derived from its sales of the drug.

50.    That same day, the Company filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 10-K"). With respect to the Company's sales of Ocaliva, the 2019 10-K stated that "[f]or the years ended December 31, 2019 and 2018, product revenue, net was comprised of U.S. Ocaliva net sales of $187.5 million and $140.8 million, respectively, and ex-

17

U.S. Ocaliva net sales of $62.1 million and $37.0 million, respectively"; and that "[f]or the years ended December 31, 2018 and 2017, product revenue, net was comprised of U.S. Ocaliva net sales of $140.8 million and $115.8 million, respectively, and ex-U.S. Ocaliva net sales of $37.0 million and $13.4 million, respectively"; further indicating to the market the sustainability of the Company's revenues derived from its sales of the drug.

51.     The 2019 10-K also discussed the Ocaliva-related deaths in PBC patients reported by the Company and the FDA in 2017, while simultaneously downplaying the continued risk of treatment with the drug, namely, by shifting the blame onto improper prescription practices by healthcare providers.   In this regard, the 2019 10-K stated that "[i]n the course of [the Company's] post-marketing pharmacovigilance activities, deaths have been reported in PBC patients with moderate or severe hepatic impairment"; that "[i]n an analysis performed by [the Company] and in consultation with the FDA, [the Company] concluded that certain of these patients were prescribed once daily doses of Ocaliva, which is seven times higher than the recommended weekly dose in such patients"; that, "[a]s a result, in September 2017, [the Company] issued a Dear Health Care Provider ('DHCP') letter"; that "the FDA also subsequently issued its own drug safety communication to reinforce recommended label dosing"; that "[b]oth communications remind healthcare providers of the importance of the recommended reduced dosing of Ocaliva in PBC patients with moderate or severe hepatic impairment, while reiterating the importance of monitoring PBC patients for progression of their disease and the occurrence of liver-related adverse reactions"; and that, "[i]n addition to the DHCP letter, [the Company] took actions to enhance education about appropriate use of Ocaliva," which included "reeducating physicians on the label, with a focus on ensuring appropriate dosing for patients

with moderate or severe hepatic impairment; enhancing monitoring of patients for liver-related adverse reactions; and adjudicating reported cases of serious liver injury, including in patients with no or mild hepatic impairment."

52.     The 2019 Form 10-K also represented that, "[i]n February 2018, [the Company] announced that the Ocaliva label in the United States had been updated by the FDA to include a boxed warning and a dosing table that reinforced the then-existing dosing schedule for patients with Child-Pugh Class B or C or decompensated cirrhosis"; that, "[i]n addition, the FDA issued an updated drug safety communication to accompany the revised label"; and that the Company "remain[s] focused on the safety of all of the patients using Ocaliva within and outside of [its] ongoing clinical studies and have engaged with relevant regulatory authorities to ensure that the Ocaliva label sufficiently reinforces the importance of appropriate dosing in patients with advanced cirrhosis."

53.     Additionally, the 2019 Form 10-K touted the regulatory hurdles the Company had overcome, and milestones they had met, in seeking to commercialize OCA in the U.S. for treating patients with liver fibrosis due to NASH, stating: "OCA has received breakthrough therapy designation from the FDA for the treatment of NASH patients with liver fibrosis"; that, "[i]n September 2019, [the Company] submitted a NDA seeking accelerated approval of OCA for liver fibrosis due to NASH in the United States"; that "[t]he FDA subsequently accepted [the Company's] NDA for filing and granted a priority review designation for OCA for liver fibrosis due to NASH"; and that "[t]he FDA has set a PDUFA target action date of June 26, 2020 for the completion of its review of [the] NDA and has notified [the Company] that it has tentatively scheduled an advisory committee meeting relating to [the] NDA for April 22, 2020."

54.     With respect to OCA's purported benefits and safety profile for treating patients with liver fibrosis due to NASH, the 2019 Form 10-K represented that "[i]n February 2019, [the Company] announced topline results from the planned 18-month interim analysis of [the] pivotal Phase 3 clinical trial of OCA in patients with liver fibrosis due to NASH, known as the REGENERATE trial"; that, "[i]n the primary efficacy analysis, once-daily OCA 25 mg met the primary endpoint agreed with the FDA of fibrosis improvement by at least one stage with no worsening of NASH at the planned 18-month interim analysis"; that "[a]dverse events were generally mild to moderate in severity and the most common were consistent with the known profile of OCA."

55.     With specific respect to safety signals observed in the REGENERATE trial, the 2019 Form 10-K represented that "[t]he frequency of serious adverse events was similar across treatment arms (11% in placebo, 11% in OCA 10 mg and 14% in OCA 25 mg) and no serious adverse event occurred in > 1% of patients in any treatment arm"; that "[t]here were 3 deaths (2 in placebo: bone cancer and cardiac arrest, 1 in OCA 25 mg: glioblastoma) and none were considered related to treatment"; that "[t]he most common adverse event reported was dose-related pruritus (19% in placebo, 28% in OCA 10 mg and 51% in OCA 25 mg)"; that "[t]he large majority of pruritus events were mild to moderate, with severe pruritus occurring in a small number of patients (< 1% in placebo, < 1% in OCA 10 mg and 5% in OCA 25 mg)"; that "[a] higher incidence of pruritus associated treatment discontinuation was observed for OCA 25 mg (< 1% in placebo, < 1% in OCA 10 mg and 9% in OCA 25 mg)"; and that, "[a]ccording to the clinical study protocol, investigator assessed severe pruritus mandated treatment discontinuation."

20

56.     In this same vein, the 2019 Form 10-K further represented that, "[c]onsistent with observations from previous NASH studies, OCA treatment was associated with an increase in low density lipoprotein ('LDL') cholesterol, with a peak increase of 22.6 mg/dL at four weeks and subsequently reversing and approaching baseline at month 18 (4.0 mg/dL increase from baseline)"; that "[s]tatin therapy was initiated in 10% of placebo patients and 24% of each OCA treatment arm"; that, "[a]mong OCA patients who initiated statins, LDL cholesterol increases reversed and fell to below baseline levels by month 6"; that "[t]riglycerides rapidly and continually decreased in the OCA treatment arms through month 18"; that "[t]here were few and varied serious cardiovascular events and incidence was balanced across the three treatment arms (2% in placebo, 1% in OCA 10 mg and 2% in OCA 25 mg)"; that, "[i]n patients with type 2 diabetes, OCA treatment was associated with an early transient increase in fasting glucose and hemoglobin A1c with return to levels similar to placebo by month 6"; that "[n]o clinically meaningful changes were noted in non-diabetic patients"; that, "[w]ith respect to hepatobiliary events, more patients (3%) on OCA 25 mg experienced gallstones or cholecystitis compared to < 1% on placebo and 1% on OCA 10 mg"; and that, "[w]hile numerically higher in the OCA 25 mg treatment arm, serious hepatic adverse events were uncommon with < 1% incidence in each of the three treatment arms."

57.     Additionally, the 2019 Form 10-K contained generic, boilerplate representations concerning risks associated with the negative side effects of the Company's OCA-based candidates and products, including Ocaliva stating that "[u]nforeseen side effects from any of [the Company's] product candidates, including OCA, could arise either during clinical development or, if approved, after the approved product has been marketed"; that "[s]erious

adverse events, including deaths, in patients taking OCA have occurred in clinical trials and in the post-marketing setting, and [the Company] cannot assure you that additional serious adverse events in patients taking OCA in clinical trials or in the post-marketing setting will not occur"; and that "[t]he most common side effects observed in clinical trials of OCA for PBC were pruritus, fatigue, headaches, nausea, constipation and diarrhea."  This risk warning was a generic, catch-all provision that was not tailored to the Company's actual known risks regarding the probability of the FDA rejecting the NDA for OCA for treating liver fibrosis due to NASH because the treatment's benefits failed to outweigh its risks, nor the foreseeability of an FDA investigation into liver disease associated with Ocaliva's use in treating PBC.

58.     The 2019 Form 10-K also contained generic, boilerplate representations regarding the risk that sales of Ocaliva may be adversely affected by safety and labeling changes required by the FDA, stating that the "events [described in ¶¶ 51-52 above, concerning the Ocaliva-related deaths and actions taken in 2017 and 2018], the revised label, any future label changes that may be required by the FDA or other relevant regulatory authorities and any safety concerns associated with Ocaliva, perceived or real, may materially and adversely affect [the Company] Ocaliva commercialization efforts and, consequently, [the Company's] financial condition and results of operations."  Plainly, this risk warning, too, was a generic, catch-all provision that was not tailored to the Company's actual known risks regarding the foreseeability of an FDA investigation into liver disease associated with Ocaliva's use in treating PBC.

59.     On May 11, 2020, the Company issued a press release reporting its first quarter 2020 financial results and certain business updates (the "May 2020 Press Release").  That press release quoted Defendant Pruzanski: "[i]n the first quarter [the Company] saw better than

22

anticipated Ocaliva net sales in [the] PBC business"; that these net sales "were supported by continued strong total prescription trends and modestly higher than expected inventory demand towards the end of the quarter as certain customers responded to the uncertainty of the early COVID-19 period"; that the Company "ha[s] taken a number of important steps intended to . . . advance NASH launch preparation activities, all while continuing to deliver solid results"; and that the Company "remain very focused on the goal of bringing the first approved therapy to patients with advanced fibrosis due to NASH and expect to be well prepared for [the] upcoming FDA advisory committee meeting, which is tentatively scheduled for June 9, 2020."

60.     Further, the May 2020 Press Release reported that "Ocaliva net sales in the first quarter of 2020 were comprised of U.S. net sales of $50.8 million and ex-U.S. net sales of $21.9 million, as compared to U.S. net sales of $38.0 million and ex-U.S. net sales of $13.8 million in the prior year quarter," and that "[t]otal revenue in the first quarter of 2019 included approximately $0.4 million of licensing revenue," further indicating to the market the sustainability of the Company's revenues derived from its sales of Ocaliva.

61.     The statements referenced in ¶¶ 44-60 were materially false and misleading because the Company made false and/or misleading statements and/or failed to disclose that: (i) the Company caused or otherwise permitted downplaying of the true scope and severity of safety concerns associated with Ocaliva's use in treating PBC; (ii) the foregoing increased the likelihood of an FDA investigation into Ocaliva's development, thereby jeopardizing Ocaliva's continued marketability and the sustainability of its sales; (iii) any purported benefits associated with OCA's efficacy in treating NASH were outweighed by the risks of its use; (iv) as a result, the FDA was unlikely to approve the Company's NDA for OCA in treating patients with liver

fibrosis due to NASH; and (v) as a result of all the foregoing, the Company's public statements were materially false and misleading at all relevant times

## THE TRUTH BEGINS TO EMERGE

62.     On May 22, 2020, the Company issued a press release providing a regulatory update concerning its NDA for OCA for treating liver fibrosis due to NASH (the "May 2020 Press Release").  That press release reported "that based on discussions earlier this week, the [FDA] has notified Intercept that its tentatively scheduled June 9, 2020 advisory committee meeting (AdCom) relating to the company's [NDA] for [OCA] for the treatment of liver fibrosis due to [NASH] has been postponed"; that "[t]he postponement will accommodate the review of additional data requested by the FDA that the company intends to submit within the next week"; that "[t]he FDA has indicated that it will reach out to Intercept in the near future with a new proposed AdCom date"; and that "Intercept now anticipates that the FDA's review of its NDA will extend beyond the Prescription Drug User Fee Act (PDUFA) target action date of June 26, 2020."

63.     On this news, Intercept's stock price fell $11.18 per share, or 12.19%, to close at $80.51 per share on May 22, 2020.  Despite this decline in the Company's stock price, the Company's securities continued to trade at artificially inflated prices as a result of the continued misrepresentations or omissions regarding the NDA for OCA for treating fibrosis due to NASH, as well as the true scope and severity of safety concerns with Ocaliva's use in treating PBC, which jeopardized Ocaliva's continued market acceptance and the sustainability of its sales.

64.     For instance, the May 2020 Press Release quoted Defendant Pruzanski: "[w]hile this delay was unanticipated, following [the Company's] most recent dialogue with the FDA [the

24

Company] believe that the additional data being submitted will be important in facilitating a more informed discussion at the AdCom," and that the Company "remain confident in [its] NDA submission and look forward to continuing to work with the FDA to bring the first treatment to patients with advanced fibrosis due to NASH."

65.     On June 29, 2020, the Company issued a press release reporting that the FDA had issued a CRL rejecting the Company's NDA for Ocaliva for the treatment of fibrosis due to NASH (the "June 2020 Press Release").  According to that press release, "[t]he CRL indicated that, based on the data the FDA has reviewed to date," the FDA "has determined that the predicted benefit of OCA based on a surrogate histopathologic endpoint remains uncertain and does not sufficiently outweigh the potential risks to support accelerated approval for the treatment of patients with liver fibrosis due to NASH."  The press release also advised that the "[t]he FDA recommends that Intercept submit additional post-interim analysis efficacy and safety data from the ongoing REGENERATE study in support of potential accelerated approval and that the long-term outcomes phase of the study should continue."

66.     In Addition, the June 2020 Press Release quoted Defendant Pruzanski: "[a]t no point during the review did the FDA communicate that OCA was not approvable on an accelerated basis"; that the Company "strongly believe that the totality of data submitted to date both meet the requirements of the [FDA]'s own guidance and clearly support the positive benefit-risk profile of OCA"; that the Company "[is] disappointed to see the determination the [FDA] has reached based on an apparently incomplete review, and without having provided medical experts and patients the opportunity to be heard at the anticipated Adcom on the merits of OCA, which is a designated Breakthrough Therapy"; that "[t]he FDA has progressively

25

increased the complexity of the histologic endpoints, creating a very high bar that only OCA has so far met in a pivotal Phase 3 study"; that, "[o]n behalf of the hepatology community, [the Company is] very concerned that the [FDA]'s apparently still evolving expectations will make it exceedingly challenging to bring innovative therapies to NASH patients with high unmet medical need"; and that the Company "plan[s] to meet as soon as possible with the FDA to review the CRL and discuss options for an efficient path forward to approval."

67.     On this news, the Company's stock price fell $30.79 per share, or 39.73%, to close at $46.70 per share on June 29, 2020.  Despite this decline in the Company's stock price, the Company's securities continued to trade at artificially inflated prices as a result of the continued misrepresentations or omissions regarding the true scope and severity of safety concerns with Ocaliva's use in treating PBC, which jeopardized Ocaliva's continued market acceptance and the sustainability of its sales.

68.     For instance, on August 10, 2020, the Company issued a press release announcing its second quarter 2020 financial results and certain business updates (the "August 2020 Press Release"). That press release quoted Defendant Pruzanski: "PBC business achieved its highest quarterly net sales to date in the second quarter"; that the Company "plan[s] to continue to invest in [their] growing PBC business"; and that the Company "anticipate[s] that [its] Ocaliva net sales, together with the announced reduction in [their] 2020 non-GAAP adjusted operating expense guidance, will help to ensure that [the Company is] financially well positioned to support the path forward in NASH."

69.     With respect to the Company's sales of Ocaliva, the August 2020 Press Release stated that the Company "recognized $77.2 million of Ocaliva net sales in the second quarter of

2020, as compared to $65.9 million in the prior year quarter"; that "Ocaliva net sales in the second quarter of 2020 were comprised of U.S. net sales of $59.6 million and ex-U.S. net sales of $17.6 million, as compared to U.S. net sales of $50.7 million and ex-U.S. net sales of $15.2 million in the prior year quarter"; and that the Company "[is] announcing 2020 Ocaliva net sales guidance of $300 million to $320 million, and lowering [the] previously announced 2020 non-GAAP adjusted operating expenses guidance by $100 million to a range of $460 million to $500 million from a range of $560 million to $600 million"; further indicating to the market the sustainability of the Company's revenues derived from its sales of the drug.

70.     The statements referenced in ¶¶ 62-69 were materially false and misleading because (i) the Company downplayed the true scope and severity of safety concerns with Ocaliva's use in treating PBC; (ii) the foregoing increased the likelihood of an FDA investigation into Ocaliva's development, thereby jeopardizing Ocaliva's continued marketability and the sustainability of its sales; and (iii) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**THE TRUTH FULLY EMERGES**

71.     On August 10, 2020, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2020 (the "2Q20 10-Q"). Rather than by press release (much less the August 2020 Press Release issued earlier that day touting sales of Ocaliva to the PBC community) or in a similarly conspicuous manner, the Company disclosed in the 2Q20 10-Q, a 97-page document, in the middle of just two paragraphs, in plain text, unadorned by emphasis, in just two out of its over sixty risk disclosures, that the FDA had initiated an investigation into whether Ocaliva caused

liver disease, rather than treating it, stating:

> **The FDA has notified us that in the course of its routine safety surveillance, in May 2020 the FDA began to evaluate a newly identified safety signal regarding liver disorder for Ocaliva which the FDA classified as a potential risk**. Pursuant to FDA guidance, this does not mean that the FDA has concluded that the drug has the listed risk or that the FDA has identified a causal relationship between Ocaliva and the potential risk. As part of our routine pharmacovigilance efforts, we have worked with the FDA to reconcile our internal safety database with the FDA Adverse Event Reporting System database and have been conducting additional signaling analysis and monitoring activities. Any safety concerns associated with Ocaliva, perceived or real, may adversely affect the successful development and commercialization of our product candidates and approved products, including Ocaliva, and materially and adversely affect our business. [Emphasis added].

72.     Given the lack of due regard and transparency with respect to this disclosure, following the filing of the 2Q20 Form 10-Q, the Company's stock price fell only $0.25 per share, or 0.47%, to close at $52.58 per share on August 11, 2020.

73.     It was not until nearly two months later, on October 8, 2020, during intraday trading hours, that news outlets and the market truly absorbed the information that the Company was "facing an investigation from the [FDA] over the potential risk of liver injury in patients taking Ocaliva, [the Company's] treatment for primary biliary cholangitis, a rare, chronic liver disease."  For instance, *Seeking Alpha* reported that "Intercept . . . is down on 60% higher volume in reaction to a report that the FDA is investigating a potential safety signal related to Ocaliva (obeticholic acid), specifically, the risk of liver injury."  The report at issue entitled "FDA investigating whether Intercept Pharma drug is tied to potential liver injury risk," published earlier that day by STAT, an outlet for in-depth biotech, pharma, policy, and life science coverage and analysis, stated that the FDA "is evaluating a potential risk of liver injury in patients who take the Intercept Pharmaceuticals drug Ocaliva to treat a certain type of liver

disease", and that "[t]he FDA's inquiry into Ocaliva began in May and could take one year to complete, Intercept spokesperson Christopher Frates told STAT."

74.     On this news, the Company's stock price fell $3.30 per share, or 8.05%, to close at $37.69 per share on October 8, 2020.

## DEMAND FUTILITY ALLEGATIONS

75.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Director Defendants.

76.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

77.     Plaintiff is a current owner of Intercept stock and has continuously been an owner of Intercept stock during all times relevant to the Director Defendants' illegal and wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

78.     During the wrongful course of conduct at the Company, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

79.     The Board is currently comprised of ten (10) members.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, five (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this

action.

80.     The Director Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects.  Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Director Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

81.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

82.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

83.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

84.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are

principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

85.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, the Director Defendants are unable to comply with their fiduciary duties and prosecute this action.  Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

86.     Additionally, and on information and belief, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

### Defendant Pruzanski

87.     Defendant Pruzanski is the CEO and President of the Company and is also a director of the Company.

88.     Defendant Pruzanski is not disinterested or independent, and therefore, is incapable of considering demand because he (as CEO) is an employee of the Company who derived substantially all his income from his employment with the Company, making him not independent.  As such, Pruzanski cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

89.     Additionally, the Company admits that Defendant Pruzanski is not independent in

its public filings with the SEC.

90.     This lack of independence and financial benefits received by Defendant Pruzanski renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

91.     In addition, Defendant Pruzanski is a defendant in the Securities Class Action rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Defendants Sblendorio, Bradbury and Santini**

92.     During the Relevant Period Defendants Sblendorio, Bradbury, and Santini served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, assuring the adequacy and effectiveness of disclosure controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

93.     Defendants Sblendorio, Bradbury, and Santini breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated by the Company as alleged herein, and otherwise failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.

94.     Therefore, Defendants Sblendorio, Bradbury, and Santini face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Benatti, Akkaraju and Gottesdiener**

95.     During the Relevant Period, Defendants Benatti, Akkaraju and Gottesdiener were

32

members of Intercept's Research and Development Committee.

96.     The purpose of the Research and Development Committee is to assist the Board in its oversight of the Corporation's strategic direction and investment in research and development, technology and manufacturing.

97.     Defendants Benatti, Akkaraju and Gottesdiener breached their fiduciary duties of due care, loyalty, and good faith, because the Research and Development Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated by the Company as alleged herein, and otherwise failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.

98.     Therefore, Defendants Benatti, Akkaraju and Gottesdiener face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**FIRST CAUSE OF ACTION**

**(Against The Director Defendants For Breach Of Fiduciary Duties)**

99.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

100.    The Director Defendants owe Intercept fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe Intercept the highest obligation of good faith, fair dealing, loyalty, and due care.

101.    The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

102.    The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their

fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the safety risks associated with Ocaliva.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

103.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, Intercept has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

104.    As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, Intercept has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of Intercept, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against The Director Defendants For Abuse Of Control)

105.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106.    The Director Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Intercept, for which they are legally responsible.

107.    As a direct and proximate result of Defendants' abuse of control, Intercept has sustained significant damages.  As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Intercept has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

34

**THIRD CAUSE OF ACTION**

**(Against The Director Defendants For Unjust Enrichment)**

108.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

109.    During the Relevant Period, the Director Defendants received bonuses, stock options, and/or similar such compensation from Intercept that were tied to the financial performance of Intercept.  The Director Defendants were unjustly enriched thereby.

110.    To remedy the Director Defendants' unjust enrichment, this Court should order defendants to disgorge their unjustly obtained bonuses and compensation.

**FOURTH CAUSE OF ACTION**

**(Against Defendant Pruzanski For Contribution Under
Sections 10(b) and 21D Of The Exchange Act)**

111.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

112.    The Company, along with Defendants Pruzanski is named as a defendant in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  If and when the Company is found liable in the Securities Class Action for these violations of law, the Company's liability will be in whole or in part due to Defendant Pruzanski's willful and/or reckless violations of his obligations as an officer and director of the Company.

113.    Through their positions of control and authority as officers of the Company, Defendant Pruzanski was able to and did, directly and/or indirectly, exercise control over the

business and corporate affairs of the Company, including the wrongful acts described in the Securities Class Action and herein.

114.    As such, Defendant Pruzanski is liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Defendants and in favor of Intercept, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.    Directing Intercept to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: December 29, 2020

GAINEY McKENNA & EGLESTON

By: */s/ Thomas J. McKenna*
    Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0380
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

37